THE HONORABLE RICARDO S. MARTINEZ

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| MSC VENTURE CORP. SDN BHD and MSC VENTURE ONE SDN BHD, | Case No. CV6-1731 RSM |
| Plaintiffs, | FOURTH AMENDED COMPLAINT |
| v. | |
| ESMOND GOEI and EVELYN GOEI, | |
| Defendants. | |
| ESMOND GOEI, | |
| Third Party Plaintiff, | |
| vs. | |
| CYPHERMETRIX, INC., a Delaware Corporation; CYPHEREDGE TECHNOLOGIES, INC., a Delaware Corporation; and JAMES B. LINKOUS, | |
| Third-Party Defendants. | |

With leave of Court pursuant to Federal Rule of Civil Procedure 15(a)(2), Plaintiffs MSC VENTURE CORPORATION SDN BHD and MSC VENTURE ONE SDN BHD, by their attorneys Schwabe Williamson & Wyatt and Hofheimer Gartlir & Gross, LLP file the following Fourth Amended Complaint and allege as follows:

FOURTH AMENDED COMPLAINT- 1

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
US Bank Centre
1420 5th Ave., Suite 3010
Seattle, WA 98101
206.622.1711

## JURISDICTION AND VENUE

1.       Plaintiff MSC Venture Corporation Sdn Bhd ("MSCVC") is a Malaysian corporation with its principal place of business in Kuala Lumpur, Malaysia.

2.       Plaintiff MSC Venture One Sdn Bhd ("MVI") is a Malaysian corporation with its principal place of business in Kuala Lumpur, Malaysia. MVI is a subsidiary of MSCVC. Collectively MSCVC and MVI will be referred to herein as "MSC" or "plaintiffs."

3.       Upon information and belief, defendant Esmond Goei ("Goei") is a citizen of the State of Colorado.

4.       Upon information and belief, defendant Evelyn Goei ("Goei") is a citizen of the State of Colorado and is the wife of Esmond Goei.

5.       This Court has subject matter jurisdiction of this matter by reason of the complete diversity of citizenship between the parties pursuant to 28 U.S.C. § 1332. The amount in controversy, exclusive of interest, is in excess of Seventy Five Thousand Dollars ($75,000).

6.       Venue exists in this District pursuant to 28 U.S.C. §§ 1391(a) because a substantial part of the events giving rise to the claims alleged herein occurred in this District.

## FIRST CLAIM FOR RELIEF

## FOR BREACH OF FIDUCIARY DUTY AGAINST DEFENDANT GOEI

7.       Plaintiffs repeat and reallege Paragraphs "1" through "6" above as if fully set forth herein.

8.       Defendant Goei was the Chief Executive Officer and a director of Cyphermetrix, Inc. ("Cyphermetrix"), a Delaware corporation with its principal place of business at 13810 SE Eastgate Way, Suite 160, Bellevue, Washington 98005. From on or about August 2003 to August 17, 2006, Goei was Chief Executive Officer of MSCVC and a director of MVI. Goei was terminated as Chief Executive Officer and director of Cyphermetrix at the end of November 2006.

FOURTH AMENDED COMPLAINT- 2

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
US Bank Centre
1420 5th Ave., Suite 3010
Seattle, WA 98101
206.622.1711

9.  While Chief Executive Officer of MSCVC and a director of MVI, Goei caused them to invest approximately Seventeen Million Three Hundred and Sixty Thousand Dollars ($17,360,000) in Cyphermetrix and/or its subsidiaries.

10.  By reason of plaintiffs' $17,360,000 investment in Cyphermetrix and/or its subsidiaries, plaintiffs owned approximately fifty-nine percent (59%) of Cyphermetrix and continue to own over fifty percent.

11.  Cyphermetrix is a holding company owning subsidiaries directly and indirectly, in the United States, China, Singapore and Malaysia. CypherEdge Technologies, Inc. ("CypherEdge"), a Delaware corporation with the same principal place of business as Cyphermetrix in Bellevue Washington, is the chief operating subsidiary of Cyphermetrix in the United States. CypherEdge is a software company whose products include software that analyzes data for telephone companies. The subsidiaries of Cyphermetrix doing business in China, Malaysia and Singapore provide software, media and advertising services.

12.  Goei, when Chief Executive Officer of MSCVC and a director of MVI, represented to plaintiffs that he was pursuing this investment in Cyphermetrix to create a Japanese style "keiretsu" in which plaintiffs' portfolio companies would compliment other companies in the group. Goei represented that this coordination of interlocking companies would benefit plaintiffs. He further represented that Cyphermetrix, as holding company for this "keiretsu" venture, should focus its business efforts in the United States and China. This alleged strategy was outlined by Goei in an article dated March 16, 2005. Pursuant to this corporate strategy, Goei induced plaintiffs to cause the corporation now known as Cyphermetrix to acquire ownership of CypherEdge. Prior to this acquisition, MVI had already invested in the corporation now known as CypherEdge.

13.  Unbeknownst to plaintiffs, Goei had an undisclosed scheme to resign from plaintiffs to become Chief Executive Officer of Cyphermetrix after plaintiffs provided the financing. In addition, Goei had an undisclosed scheme to divert all United States assets

FOURTH AMENDED COMPLAINT- 3

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
US Bank Centre
1420 5th Ave., Suite 3010
Seattle, WA 98101
206.622.1711

1  of Cyphermetrix to its Asian subsidiaries where he would wrest ownership and control away
2  from Cyphermetrix and plaintiffs, as the principal owner of Cyphermetrix.

3       14.    Goei, in breach of the fiduciary duty that he owed to plaintiffs and in breach
4  of applicable law, engaged in a de facto liquidation of the United States based assets of
5  Cyphermetrix, including CypherEdge. Without the requisite board and shareholder approval,
6  Goei had been causing the assets of CypherEdge, Cyphermetrix's principal United States
7  subsidiary, to be transferred without fair consideration to Asian subsidiaries and affiliates of
8  Cyphermetrix.

9       15.    Many of the known actions of Goei defy rationality and constitute a willful
10 waste of corporate assets. Upon information and belief, Goei caused Cyphermetrix and
11 CypherEdge to engage in a liquidation of assets in the United States, without any attempt to
12 maximize the value of the assets. This willful destruction of a business is contrary to any
13 possible reasonable business judgment. Goei acted intentionally with a purpose other than
14 advancing the best interests of Cyphermetrix and with the intent to violate applicable positive
15 law.

16      16.    This willful destruction of the United States assets of Cyphermetrix and/or
17 CypherEdge demonstrates that there had been a sustained and systematic failure of the
18 directors of Cyphermetrix to exercise oversight over the actions of Goei and an utter failure
19 by the directors to attempt to assure that a reasonable information and reporting system
20 existed such that the directors knew what actions Goei was taking.

21      17.    The wrongful and destructive acts of Goei included the following:

22           A.    On or about March 31, 2005, CypherEdge (then known as
23 NexusEdge, Inc. ("NexusEdge")) acquired Cyphermetrix, Inc., a software company, for
24 approximately $2 Million in NexusEdge stock. In September, 2006 the CypherEdge
25 (NexusEdge) stock was converted to CypherEdge stock as part of Goei's "keiretsu" strategy.
26 By reason of this acquisition, CypherEdge was able to acquire a contract to implement

FOURTH AMENDED COMPLAINT- 4

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
US Bank Centre
1420 5th Ave., Suite 3010
Seattle, WA 98101
206.622.1711

PDX/116428/151807/SPB/2709323.1

"CallMine" software developed by CypherEdge into the data base of one of the largest United States cell phone carriers. This contract required that the underlying data remain secure within the United States. Upon information and belief, this contract is the largest contract held by CypherEdge. Notwithstanding these contractual provisions and notwithstanding applicable privacy laws of the United States, Goei caused the sensitive client data to be stored in servers located in China and/or Singapore. Goei further caused the source code for the "CallMine" software to be brought to China and/or Singapore. There is inadequate security protection for this source code and data offshore. Upon information and belief, Goei willfully breached the largest contract of CypherEdge and compromised the security of one of its principal assets as part of a scheme to remove all Cyphermetrix assets to Asia where he could have complete and unfettered control.

B.     Goei caused United Sino-Resources Pte Ltd. ("USR Singapore"), a Singapore company doing business in China, which is an indirect subsidiary of Cyphermetrix, to overbill CypherEdge in an amount in excess of $500,000. By this fraudulent scheme, Goei caused assets of CypherEdge to be transferred to Singapore and/or China. Goei further terminated the licensing of the "CallMine" software in the United States (despite it being the basis for the largest contract of CypherEdge) and directed the transfer of this software to China. Upon information and belief, Goei had been operating a separate business, owned by him, through the facilities and employees of USR Singapore and had been using the assets of CypherEdge to finance his own, separate, independent business.

C.     As part of a scheme to transfer funds to Cosmos Discovery Sdn Bhd ("Cosmos"), an indirect subsidiary of Cyphermetrix, in 2005 Goei caused each of the corporate parents of USR Singapore and Infosation Pte Ltd. ("Infosation"), another indirect subsidiary of Cyphermetrix, to pay Cosmos One Million Dollars ($1,000,000) for a two year right of first refusal for business ventures to be entered into by Cosmos. By these means Goei caused a total of $2,000,000 to be transferred to Cosmos without the knowledge or consent

FOURTH AMENDED COMPLAINT- 5

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
US Bank Centre
1420 5th Ave., Suite 3010
Seattle, WA 98101
206.622.1711

of the directors of MSCVC and MV1. When Cosmos actually did proceed to enter into a business venture later in 2005, Goei caused USR Singapore and Infosation to waive the right of first refusal. Upon information and belief, USR Singapore and Infosation never entered into any transaction with Cosmos and the right of first refusal had no value for them. Upon information and belief, these rights of first refusal were a sham and a means to benefit Goei's own personal business interests in China undertaken through, or in conjunction with, Cosmos. By these means Goei sought to evade the charter of MV1 which allowed no more than ten (10%) percent of this fund to be invested in any single portfolio company. Despite this and further pleaded unlawful diversions of funds to Cosmos, Cosmos became insolvent by 2007, and the diverted funds were not recoverable.

D.      As part of his scheme to divert funds to China, Goei caused CypherEdge, including its predecessor in interest NexusEdge, to loan $1,750,000 to Cyphermetrix, which in turn loaned the $1,750,000 to Cosmos. By these means Goei diverted to Cosmos $1,750,000 that plaintiffs had invested in CypherEdge for development of software products. Again, these loans were part of Goei's means to evade the charter of MV1 which limited the amount that MV1 could invest in Cosmos. Plaintiffs invested an additional $1,750,000 in CypherEdge to replace the funds misappropriated by Goei. By reason of the unlawful diversion of $1,750,000 by Goei, plaintiffs were damaged in the amount of $1,750,000.

E.      MV1 approved the investment of Three Million Dollars ($3,000,000) to acquire and invest in a corporation known as IEI Technologies (China) Ltd., a Chinese corporation ("IEI China"). In anticipation of this investment, MV1 deposited Three Million Dollars in United Sino-Resources Sdn Bhd ("USR Malaysia"). Goei determined not to proceed with the acquisition and investment in IEI China. The proposed acquisition was cancelled in or around August 2005. Goei never informed the directors of MSCVC or MV1 that the IEI China transaction had been cancelled. Instead, Goei, without

FOURTH AMENDED COMPLAINT- 6

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
US Bank Centre
1420 5th Ave., Suite 3010
Seattle, WA 98101
206.622.1711

1   the knowledge or consent of the directors of plaintiffs, diverted Two Million ($2,000,000)

2   Dollars to USR Singapore purportedly for software development. Goei used a portion of

3   these funds to pay himself compensation which he was later forced to re-classify as a loan

4   and repay. USR Singapore never had any material revenues and dissipated all the funds

5   provided to it. USR Singapore was insolvent by the end of 2006 and has no value today.

6   Goei, without the knowledge of consent of the directors of plaintiffs, diverted the other One

7   Million Dollars ($1,000,000) to Cosmos based on the sham right of first refusal acquired for

8   the so-called benefit of USR Singapore, a worthless right. By reason of this unauthorized

9   diversion of $3,000,000, Goei damaged plaintiffs in the amount of $3,000,000. Goei

10  acknowledged that he faced criminal prosecution by reason of this $3,000,000

11  misappropriation.

12          F.      As part of his scheme to divert funds to China, in 2006 Goei

13  caused Infosation to loan Cyphermetrix the amount of One Million Seven Hundred Fifty

14  Thousand Dollars ($1,750,000) and for Cyphermetrix to, in turn, loan this $1,750,000 to

15  Cosmos. Said diversion of the $1,750,000 to Cosmos, funds that MV1 had invested in

16  Infosation, together with the diversion of the $1,000,000 from Infosation to Cosmos by

17  means of the sham right of first refusal pleaded previously, was done without the knowledge

18  or consent of the directors of MSCVC and MV1. Indeed, the diversion of this aggregate total

19  of $2,750,000 was done in direct contravention of the business plan for the investment of

20  $4,000,000 in Infosation (then named Amico Pte Ltd.), which business plan had been

21  approved by the board of directors of MV1 on April 1, 2005. By these means Goei evaded

22  the restrictions on the amount that MV1 could invest in Cosmos. Since Cosmos was

23  insolvent by 2007 and the diverted $1,750,000 was not recoverable, this diversion damaged

24  plaintiffs in the amount of $1,750,000.

25          G.      As part of his campaign to discontinue all United States operations

26  and transfer assets to China and Singapore, Goei either terminated all CypherEdge

FOURTH AMENDED COMPLAINT- 7

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
US Bank Centre
1420 5th Ave., Suite 3010
Seattle, WA 98101
206.622.1711

1  employees in the United States and/or placed them on "forced vacation." These terminations

2  were in violation of contractual rights of the employees and left CypherEdge unable to

3  conduct business in the United States.

4          H.      The termination of employment of CypherEdge's employees by

5  Goei made it impossible for CypherEdge to provide customer support for software that it had

6  sold or licensed. For example, Xerox Corporation executed a three year Master Services

7  Agreement for use of Intelligent Services Network software on July 27, 2006. (Intelligent

8  Services Network software had been developed by RazorLynx, LLC, a company acquired by

9  CypherEdge on or about December 31, 2005). The Master Services Agreement included a

10  substantial investment by Xerox for marketing this software to some of its highest profile

11  clients. CypherEdge obtained the benefit of the Master Services Agreement including

12  revenue from the first two sales by Xerox, but could not fulfill its contractual obligations to

13  Xerox to service the software because it has terminated all its employees. Based on Goei's

14  actions, Xerox terminated the Master Services Agreement with CypherEdge on or about

15  October 28, 2006.

16          I.      In the second half of 2006, NER Data Products (West), Inc.

17  ("NER") approached CypherEdge with an offer to purchase a license for Intelligent Services

18  Network software in North America for a 2% license fee including a $1,000,000 minimum

19  payment. This agreement would have been, except for a few particular companies, non-

20  exclusive. Goei broke off these negotiations and thereafter sought to license the same

21  Intelligent Services Network software in North America and Europe for a minimum payment

22  of only $112,000 as part of a 1% license fee. This subsequent proposed agreement was for

23  full exclusive use of the Intelligent Services Network software for the Americas and Europe,

24  which destroyed the ability to license the software to others.

25          J.      Goei refused to allow CypherEdge software to be sold or licensed

26  in the United States, stating that this software will all be transferred to operations in China.

FOURTH AMENDED COMPLAINT- 8

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
US Bank Centre
1420 5th Ave., Suite 3010
Seattle, WA 98101
206.622.1711

K.    Upon information and belief, Goei without authorization took personal loans from subsidiaries of Cyphermetrix of approximately $300,000 and sought to alter the books and records to show that no amounts were owed by him. Upon further information and belief, Goei caused Cyphermetrix and/or its subsidiaries to accrue salary for him while he still was Chief Executive Officer of plaintiffs, and to pay him this accrued "salary" after he became Chief Executive Officer of Cyphermetrix.

L.    On or about August 18, 2006, Goei obtained a $191,870 bonus in Singapore dollars (approximately $122,000 American dollars) from Infosation. Goei further received a salary of $20,000 a month in Singapore dollars (approximately $12,700 American dollars) from Infosation from August 18, 2006 through November 2006 (a total of $68,000 in Singapore dollars). In total, Goei received $259,870 in Singapore dollars (approximately $165,000 in American dollars) in compensation from Infosation in 2006, yet provided no services to Infosation. There was no consideration for these payments to Goei. The directors of Cyphermetrix, to the extent that they ratified these payments, could have done so consistent with the fiduciary duties that they owed to Cyphermetrix only upon the understanding that Goei would provide future services in exchange for this compensation, which services Goei never provided.  Moreover, these funds were diverted from Infosation in contravention of the business plan by which MV1 invested the $4,000,000 in Infosation.

M.    Goei, prior to his termination, caused Cyphermetrix and its subsidiaries to destroy and remove records. In particular, on or around November 30, 2006, Goei instructed employees to clean out and remove files (including electronically shared information) and to remove hard drives and computers. Goei willfully attempted to impede investigation of his wrongdoing and plaintiffs' ability to recover from him.

N.    Goei devised "poison pills" in portfolio companies, including, on information and belief, Primary Edge Technologies Sdn Bhd (formerly known as Primary Setup Sdn Bhd) ("Primary Edge"), USR Singapore (or its parent USR Malaysia), Infosation,

FOURTH AMENDED COMPLAINT- 9

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
US Bank Centre
1420 5th Ave., Suite 3010
Seattle, WA 98101
206.622.1711

Cyphermetrix and Cypheredge. These poison pills inflicted penalties upon plaintiffs if, <u>inter alia</u>, Goei, for any reason, left their alleged employment. The most egregious example of Goei's poison pills involved Primary Edge. This poison pill inflicted penalties upon MVI if, <u>inter alia</u>, Goei left the employment of MV1 or Primary Edge. (Despite the fact that the "poison pill" provision for Primary Edge contains language referring to Goei's purported employment by MVI or Primary Edge, Goei was at all times relevant hereto only an MVI director and was employed only by MSCVC. Accordingly, plaintiffs have contested Lau Boon Hwee's claim to recover on his suit to enforce his alleged poison pill rights. It appears that Alan Tan, MSCVC's general counsel, who was corrupted by Goei, drafted the poison pill provision carelessly. Notwithstanding this defective drafting, Mr. Lau has brought suit to enforce his alleged poison pill rights). To obtain this poison pill, Goei falsely represented to the investment committee of MVI that Lau Boon Hwee, as principal owner of the Company to be acquired by Primary Edge, had demanded (i) a right to obligate MVI to purchase his shares of Primary Edge for S $1,200,000 if Goei, for any reason, left his purported employment with MVI or Primary Edge (<u>i.e.</u> a right to put his shares to MVI) or (ii) a right to a golden parachute of eighteen months' payment of salary after Mr. Lau's employment at Primary Edge had ended. In fact, it was Goei who conceived of this poison pill and this golden parachute and who instructed Mr. Lau to ask for these provisions be included in the proposed transaction and instructed Alan Tan to include these provisions in the proposed documents. In other words, Goei, as CEO of MSCVC and a director of MVI, arranged to include provisions that were to benefit himself and Mr. Lau and that were intended to be inimical to the interests of Goei's employer, MSCVC and its subsidiary, MVI. Based on Goei's false representations, the investment committee of MVI approved a proposed transaction in which Mr. Lau would be entitled to an S $1,200,000 poison pill or a golden parachute of 18 months. Subsequently, in return for the promise of payments to him from Primary Edge (<u>i.e.</u> kick-backs), Goei agreed to increase the poison pill to S $3,000,000 and to

FOURTH AMENDED COMPLAINT- 10

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
US Bank Centre
1420 5th Ave., Suite 3010
Seattle, WA 98101
206.622.1711

1   allow Mr. Lau to have an 18 month golden parachute as well. By these unlawful and

2   fraudulent actions, Goei sought to give himself bargaining leverage against MSCVC,

3   creating a penalty if he left his alleged employment by MVI or his alleged employment by

4   Primary Edge.

5              O.     Goei was of the opinion that MSCVC did not pay him sufficient

6   compensation. He deemed himself worthy of a higher salary and complained about the

7   failure of MSCVC to pay him sufficient amounts in bonuses and its alleged refusal to allow

8   him carried interests in the portfolio companies. To obtain the compensation that he thought

9   he deserved, Goei devised an unlawful scheme to obtain compensation from portfolio

10  companies. Goei was paid as a full time CEO of MSCVC, and in that position also worked

11  on behalf of portfolio companies in which MSCVC and/or MVI had invested. MSCVC

12  requested that certain portfolio companies reimburse it for Goei's time spent on their behalf.

13  Goei was of the opinion that he, not MSCVC, deserved this additional compensation. For

14  example, when Goei suggested to Mr. Lau to increase the Primary Edge "poison pill," he

15  sought to be paid compensation as a director of Primary Edge. Upon information and belief,

16  Goei caused MVI to invest more funds than Mr. Lau had requested for Primary Edge so that

17  funds would be available to pay Goei this additional illegal compensation. Upon information

18  and belief, any funds Primary Edge had available to pay Goei were derived from the

19  investment of MVI. The amount and the extent of kick-backs that Goei received from

20  Primary Edge or any other portfolio company is unknown to plaintiffs. Upon information

21  and belief, as part of the kick-back scheme with Mr. Lau, Goei caused Mr. Lau to invest in

22  Aspect Technologies, Inc., a corporation in which Goei was a principal owner. Further, as

23  pleaded above, Goei caused certain portfolio companies to pay or to accrue compensation for

24  him. Primary Edge, including its subsidiaries SMSHub Pte Ltd. ("SMSHub") and Affinity

25  Communications Pte Ltd. ("Affinity"), accrued compensation of S $10,000 a month for Goei.

26  Goei also requested Cypheredge and Infosation to accrue salary for him. Accrued salary

FOURTH AMENDED COMPLAINT- 11

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
US Bank Centre
1420 5th Ave., Suite 3010
Seattle, WA 98101
206.622.1711

1    from Infosation of approximately $122,000 was subsequently paid to Goei as a "signing

2    bonus" when he became the full time Chief Executive Officer of Cyphermetrix. This

3    $122,000 represented Goei's calculation of the so-called shortfall in compensation that he

4    deemed he deserved while a full time employee of MSCVC.

5           P.    Goei, without the knowledge or consent of plaintiffs also used his

6    position as CEO of MSCVC to obtain warrants and options in the portfolio companies for

7    himself and his allies. Goei pursued this scheme because he believed that he was not

8    included in the profit-sharing scheme approved by the MSCVC Board. Goei then sought to

9    "compensate" himself by obtaining equity interests in the portfolio companies without the

10   knowledge and consent of his employer, MSCVC. Goei had three goals:

11          1.   To enrich himself with warrants and options that he projected would have a

12   value of in excess of Six Hundred Million Dollars ($600,000,000.00).

13          2.   To dilute control of MSCVC and MVI over the portfolio companies so as to

14   make them minority shareholders, and grant himself effective control over these portfolio

15   companies, in particular Cyphermetrix and its subsidiaries. Goei sought to create a position

16   for himself as a controlling person of the portfolio companies once he left the employment of

17   MSCVC.

18          3.   To corrupt other officers and others affiliated with MSCVC by offering them

19   warrants and options. By these means Goei attempted to cause these employees and outside

20   professionals retained by MSCVC to be loyal to him rather than to MSCVC.

21          Q.    Goei fashioned himself as Robin Hood, with the goal of stealing

22   from MSCVC for the benefit of himself and those he called his "Merry Men." These "Merry

23   Men" were the other senior employees of MSCVC. Goei explicitly used this Robin Hood

24   analogy when he organized the shadow organization of "MM Capital" (i.e. Merry Men

25   Capital). The goal of MM Capital was, inter alia, to wrest control of the portfolio companies

26   away from MSCVC and MVI and to enrich Goei and those MSCVC employees that he

FOURTH AMENDED COMPLAINT- 12

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
US Bank Centre
1420 5th Ave., Suite 3010
Seattle, WA 98101
206.622.1711

1  sought to corrupt.

2         R.    By reason of Goei's scheme to take control of the portfolio

3  companies, while CEO of MSCVC, Goei took steps to decrease MSCVC's control over these

4  portfolio companies.  Goei further did not seek those control provisions that MSCVC, as a

5  venture capitalist, had a right to expect.  For example, MSCVC, as the majority shareholder

6  and the provider of virtually all funds to Cyphermetrix had no seat on the board of directors

7  of Cyphermetrix.

8         S.    Goei intentionally and purposely hid his schemes from MSCVC.

9  He would provide MSCVC with inaccurate and incomplete minutes of board meetings of

10  portfolio companies to conceal his wrongdoing.  Goei instructed his subordinates at MSCVC

11  to keep information from the board of MSCVC.

12         T.    Goei's conduct went far beyond mere civil misconduct.   If

13  American law governed his conduct while CEO of MSCVC, Goei would be liable under the

14  Racketeer Influenced and Corrupt Organizations Act ("RICO") 18 U.S.C. §§ 1961 et seq.

15  He engaged in a prototypical RICO pattern of racketeering.

16      18.    Upon information and belief, it was Goei's scheme to divert all United States

17  assets of Cyphermetrix to China and Singapore where he would gain ownership and control.

18  Upon information and belief, the directors of Cyphermetrix have not been properly advised

19  of, nor have they authorized or approved, this strategy, which was intended to benefit Goei

20  personally and to harm plaintiffs.

21      19.    Goei, as Chief Executive Officer of MSCVC and a director of MVI, owed

22  them a fiduciary duty while he served in that capacity. Goei, as both Chief Executive Officer

23  and director of Cyphermetrix owed the fiduciary duty of loyalty, care, good faith and fair

24  dealing to plaintiffs.

25      20.    By reason of Goei's above-pleaded willful scheme to destroy the United

26  States operations of CypherEdge and his transfer of assets to China and Singapore, as

FOURTH AMENDED COMPLAINT- 13

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
US Bank Centre
1420 5th Ave., Suite 3010
Seattle, WA  98101
206.622.1711

1   pleaded above, and by reason of Goei's undisclosed schemes to be compensated by the

2   portfolio companies and dilute control of MSCVC over the portfolio companies and seize

3   control himself and by reason of diverting assets without the authorization of plaintiffs, Goei

4   violated the fiduciary duties of loyalty, care, good faith and fair dealing that he owed as

5   Chief Executive Officer of MSCVC and that he owed as a director of MVI, and that he owed

6   as Chief Executive Officer of Cyphermetrix, to plaintiffs.

7       21.    Goei, in breach of the fiduciary duties that he owed to plaintiffs, has pursued a

8   scheme to enrich himself at plaintiffs' expense. Upon information and belief, at plaintiffs'

9   expense Goei was attempting to create a software media and advertising conglomerate

10  "keiretsu" in China that would be owned and controlled by him.

11      22.    By reason of the foregoing, plaintiffs have been damaged in the amount of

12  Seventeen Million Three Hundred Sixty Thousand Dollars ($17,360,000) together with

13  interest accrued thereupon.

14              **SECOND CLAIM FOR RELIEF**

15      **FOR COMMON LAW FRAUD AGAINST DEFENDANT GOEI**

16      23.    Plaintiffs repeat and reallege Paragraphs "1" through "22" above as if fully set

17  forth herein.

18      24.    Goei represented to plaintiffs, as pleaded above, that he was creating a

19  "keiretsu" through Cyphermetrix for the benefit of plaintiffs. Goei further represented that

20  the United States would be one of the two markets that he would pursue.

21      25.    Contrary to Goei's representations, he was pursuing a scheme by which he

22  would gain ownership and control of the assets of Cyphermetrix, and have these United

23  States assets transferred to Asian entities under his ownership and/or control. Goei was

24  pursuing a scheme to use plaintiffs' funds to finance a conglomerate for his personal benefit.

25      26.    Goei made his misrepresentations to plaintiffs with knowledge that they were

26  false when made.

FOURTH AMENDED COMPLAINT- 14

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
US Bank Centre
1420 5th Ave., Suite 3010
Seattle, WA 98101
206.622.1711

27.     Plaintiffs relied upon Goei's misrepresentations and based thereupon, agreed to invest the Seventeen Million Three Hundred Sixty Thousand Dollars ($17,360,000) in Cyphermetrix.

28.     By reason of Goei's misrepresentations, plaintiffs have been damaged.

### THIRD CLAIM FOR RELIEF

### FOR FRAUDULENT NON-DISCLOSURE AGAINST DEFENDANT GOEI

29.     Plaintiffs repeat and reallege Paragraphs "1" through "28" above as if fully set forth herein.

30.     As a fiduciary of plaintiffs, Goei owed them a duty of full disclosure.

31.     Goei had and failed to disclose to plaintiffs his scheme to use plaintiffs' investments to fund a conglomerate of companies owned principally by Goei in China. Goei never disclosed his scheme to shut down all United States operations and divert these assets to China and Singapore.

32.     Had Goei disclosed his scheme to create a Chinese conglomerate owned and controlled principally by him and to eviscerate the operations of Cyphermetrix in the United States to benefit operations in China and Singapore owned and/or controlled by him, plaintiffs would not have invested in Cyphermetrix.

33.     By reason of the fraudulent non-disclosures of Goei, plaintiffs have been damaged in the amount of Seventeen Million Three Hundred Sixty Thousand Dollars.

### FOURTH CLAIM FOR RELIEF

### FOR BREACH OF FIDUCIARY DUTY AGAINST DEFENDANT GOEI

34.     Plaintiffs repeat and reallege Paragraphs "1" through "33" above as if fully set forth herein.

35.     From on or about August 18, 2003 to August 17, 2006, Goei was Chief Executive Officer of MSCVC and a director of MVI. Plaintiffs were, and continue to be, venture capital entities. As Chief Executive Officer of MSCVC and as a director of MVI,

FOURTH AMENDED COMPLAINT- 15

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
US Bank Centre
1420 5th Ave., Suite 3010
Seattle, WA 98101
206.622.1711

1  Goei owed plaintiffs a duty of loyalty, care, good faith and fair dealing.

2      36.     As venture capitalists, plaintiffs invest millions of dollars in start-up

3  corporations. When plaintiffs invest in a start-up corporation, they insist upon having

4  representation on its board of directors. Upon information and belief, this demand for board

5  representation is a policy common to virtually all venture capitalists. Having a director on the

6  board allows the venture capitalist full access to corporate information and the ability to

7  shape and influence corporate decisions.

8      37.     One of the corporations for which plaintiffs provided venture capital financing

9  is Farallon Medical, Inc. ("Farallon"). Plaintiffs invested Two Million Eight Hundred

10  Twenty Nine Thousand and Eighty Eight Dollars ($2,829,088) in Farallon. On a converted

11  basis, plaintiffs own approximately Twenty Five (25%) percent of Farallon. Upon

12  information and belief, plaintiffs (with their interests aggregated) constitute the largest

13  shareholder of Farallon.

14      38.     Pursuant to a Voting Agreement dated June 7, 2005 by and among, inter alia,

15  plaintiffs and Farallon, plaintiffs were entitled to elect at least one director of Farallon's

16  board of directors (and depending upon other conditions they could be entitled to elect two

17  directors).

18      39.     The Amended and Restated Voting Agreement dated June 2, 2006, executed

19  by all parties to this lawsuit, purported to supersede and replace the original Voting

20  Agreement. In relevant part the Amended and Restated Voting Agreement provides:

21      2. Election of Boards of Directors.

22

23      (a)     Vote.  During the term of this Agreement, each Voting
            Party agrees to vote all Shares in such manner as may

24            be necessary to elect (and maintain in office) as
            members of the Company's Board of Directors the

25            following individuals:

26          (i)     One (1) Preferred Designee (as defined below)

FOURTH AMENDED COMPLAINT- 16

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
US Bank Centre
1420 5th Ave., Suite 3010
Seattle, WA 98101
206.622.1711

as a Preferred Director;

    (ii)    One (1) Common Designee (as defined below) as the Common Director; and

    (iii)    Two (2) Mutual Designees (as defined below)as the Mutual Directors.

    (b)    Designation of Directors. The designees to the Company's Board of Directors described above (each a "Designee") shall be designated as follows:

    (i)    The "Preferred Designee" shall be the Chairman of the Board of Directors and shall be designated by MSC Ventures.

    (ii)    The "Common Designee" shall be the Company's President and Chief Executive Officer.

    (iii)    The "Mutual Designees" shall be designated by the Preferred Designee and the Common Designee.

    (c)    Current Designees. For the purpose of this Agreement, the current directors of the Company shall be deemed to be the following Designees: (i) Esmond Goei shall be the Preferred Designee; (ii) James T. McKinley shall be the Common Designee, and (iii) Richard Char shall be a Mutual Designee.

    (d)    Changes in Designees. From time to time during the term of this Agreement, Voting Parties who hold sufficient Shares to select a Designee pursuant to this Agreement (in the event that Voting Parties have the right to designate a Designee) or individuals who have a right to designate a Designee may, in their sole discretion:

    (i)    notify the Company in writing of an intention to remove from the Company's Board of Directors any incumbent Designee who occupies a Board seat for which such Voting Parties are entitled to designate the Designee or for which such individual is entitled to designate the Designee, as the case may be; or

    (ii)    notify the Company in writing of an intention to

FOURTH AMENDED COMPLAINT- 17

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
US Bank Centre
1420 5th Ave., Suite 3010
Seattle, WA 98101
206.622.1711

select a new Designee for election to a Board seat for which such Voting Parties are entitled to designate the Designee or for which such individual is entitled to designate the Designee (whether to replace a prior Designee or to fill a vacancy in such Board seat), as the case may be;

In the event of such an initiation of a removal or selection of a Designee under this section, the Company shall take such reasonable actions as are necessary to facilitate such removals or elections, including, without limitation, soliciting the votes of the appropriate stockholders, and the Voting Parties shall vote their Shares to cause: (a) the removal from the Company's Board of Directors of the Designee or Designees so designated for removal; and (b) the election to the Company's Board of Directors of any new Designee or Designees so designated.

<u>Notwithstanding the above, MSC Ventures may not remove Esmond Goei as the Preferred Designee without Esmond Goei's consent.</u>

(emphasis added).

40.    Defendant Goei purported to execute the Amended and Restated Voting Agreement on behalf of plaintiffs.

41.    Goei did not inform plaintiffs of the restriction, added for the first time in the Amended and Restated Voting Agreement, that plaintiffs could not remove him as the Preferred Designee without his consent. Plaintiffs learned of this provision only after the Amended and Restated Voting Agreement had been executed. Goei executed the Amended and Restated Voting Agreement containing this provision giving Goei veto power over his removal without the knowledge and consent of the directors of plaintiffs. Goei had no authority to execute the Amended and Restated Voting Agreement containing this limitation on his removal.

42.    By executing the Amended and Restated Voting Agreement providing that he could not be removed as the Preferred Designee without his consent, Goei violated the

FOURTH AMENDED COMPLAINT- 18

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
US Bank Centre
1420 5th Ave., Suite 3010
Seattle, WA 98101
206.622.1711

1  fiduciary duties of loyalty, care, good faith and fair dealing that he owed to plaintiffs. Goei

2  unlawfully misused his position as Chief Executive Officer of MSCVC and as a director of

3  MVI to further his own personal interests at the expense of plaintiffs' interests.

4      43.    Goei had a three year employment agreement to serve as Chief Executive

5  Officer of MSCVC which terminated on August 17, 2006. Upon information and belief,

6  when Goei purported to execute the Amended and Restated Voting Agreement on or about

7  June 6, 2006, he knew that a little over two months later he would no longer have a position

8  with plaintiffs. Goei submitted a resignation letter on August 18, 2006, a day after his

9  employment agreement had expired. Upon information and belief, Goei intentionally

10 negotiated for and obtained his alleged right to remain as Preferred Designee for so long as

11 he chose as an illicit means to provide him with leverage in negotiating with plaintiffs.

12     44.    By reason of Goei's actions, plaintiffs had no board representation on

13 Farallon's board between August 17, 2006 and February 6, 2007. They did not have insider

14 access to information nor could they participate in the development and implementation of

15 corporate policy and decision making. During this period, Farallon agreed to pay

16 compensation and stock options to Goei and one of his associates which plaintiffs would

17 have opposed. The stock options granted to Goei and his associate were at a below market

18 stock price, which, upon information and belief, was contrary to Farallon's stock option plan.

19 Goei, while serving as a fiduciary of plaintiffs, intentionally thwarted and interfered with

20 corporate policies of plaintiffs, and sought to further his own personal financial interests.

21     45.    Goei had taken no action to expressly and unequivocally resign as the

22 Chairman of the Board of Farallon. By reason of Goei having been the Preferred Designee,

23 he remained as the Chairman of the Board of Farallon.

24     46.    On or about February 6, 2007 Farallon agreed to provide a seat upon its board

25 of directors to MSCVC but not as Chairman of the Board, to which position MSCVC was

26 entitled to appoint its representative.

FOURTH AMENDED COMPLAINT- 19

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
US Bank Centre
1420 5th Ave., Suite 3010
Seattle, WA 98101
206.622.1711

47.     By reason of having no board representation from August 17, 2006 to February 6, 2007 the value of plaintiffs' investment in Farallon was damaged.

48.     By reason of Goei serving as Chairman of the Board of Farallon instead of a designee of MSCVC, the value of plaintiffs' investment in Farallon has been damaged.

49.     By reason of Goei's breach of fiduciary duty as pleaded above, plaintiffs have been damaged in an amount to be determined, but not less than One Million ($1,000,000) Dollars.

## FIFTH CLAIM FOR RELIEF

## FOR BREACH OF CONTRACT AND

## BREACH OF FIDUCIARY DUTY AGAINST BOTH DEFENDANTS

50.     Plaintiffs repeat and reallege Paragraphs "1" through "49" above as if fully set forth herein.

51.     On August 18, 2003, Goei entered into a written employment agreement with MSCVC (the "Employment Agreement").

52.     The Employment Agreement provided in relevant part that:

> "The Employee [i.e. Goei] is also prohibited from acquiring any shares or interests in any of the company's clients without the prior approval in writing from the Chief Executive Officer of the Multimedia Development Corporation."

53.     Secretly and unbeknownst to plaintiffs, on or about November 11, 2004, the board of directors of Farallon authorized the issuance of 393,333 warrants to Goei individually. Upon information and belief, the warrants were issued on December 21, 2004, had an exercise price of five ($.05) cents a share and expire on December 20, 2014.

54.     Goei never received any written permission from plaintiffs' directors and/or from the Chief Executive Officer of the Multimedia Development Corporation to acquire

FOURTH AMENDED COMPLAINT- 20

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
US Bank Centre
1420 5th Ave., Suite 3010
Seattle, WA 98101
206.622.1711

these warrants from Farallon.

55.    At the time that Goei obtained these warrants, he was working full time for MSCVC and its subsidiaries and affiliates, and had no right to additional compensation from an entity in which plaintiffs invested.

56.    The 393,333 warrants were earned by Goei by reason of his duties as an officer of plaintiffs, and should have been issued in the name of, and delivered to, plaintiffs.

57.    Upon information and belief, Goei never advised or informed Farallon that he could not lawfully accept the 393,333 warrants.

58.    Upon information and belief, Farallon offered to provide the warrants, and did provide the warrants, to Goei to influence his actions as the Chief Executive Officer of MSCVC and as a director of MVI.

59.    On or about June 3, 2006, Goei caused the 393,333 warrants to be transferred to his wife Evelyn Goei.

60.    Upon information and belief, Goei transferred the 393,333 warrants to his wife in an attempt to defeat the claims of plaintiffs.

61.    Upon information and belief, Evelyn Goei conspired with her husband Goei to secrete the 393,333 warrants unlawfully obtained by Goei so as to defeat the claims of plaintiffs.

62.    Goei breached his Employment Agreement and the fiduciary duty he owed to plaintiffs by secretly obtaining the 393,333 warrants for himself. By accepting these warrants from Goei, Evelyn Goei is liable, jointly and severally with him, for his breach of the Employment Agreement and his breach of fiduciary duty. All such compensation unlawfully paid to Goei and transferred to Evelyn Goei is the property of plaintiffs.

63.    Upon information and belief, the warrants had a value of in excess of One Million ($1,000,000) Dollars.

64.    By reason of the foregoing, plaintiffs have been damaged by defendants in an

FOURTH AMENDED COMPLAINT- 21

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
US Bank Centre
1420 5th Ave., Suite 3010
Seattle, WA 98101
206.622.1711

PDX/116428/151807/SPB/2709323.1

1    amount to be determined, but in excess of One Million ($1,000,000) Dollars.

2                            **SIXTH CLAIM FOR RELIEF**

3              **FOR CONVERSION AGAINST BOTH DEFENDANTS**

4            65.     Plaintiffs repeat and reallege Paragraphs "1" through "64" above as if fully set

5    forth herein.

6            66.     The 393,333 warrants were unlawfully issued in the name of Goei, were

7    unlawfully transferred to Evelyn Goei and are the rightful property of plaintiffs.

8            67.     Goei unlawfully converted the 393,333 warrants, which are equitably owned

9    by plaintiffs, into property owned of record by himself, and thereafter transferred record

10   ownership of this property of plaintiffs to his wife, Evelyn Goei.

11           68.     By reason of this conversion of plaintiffs' warrants by defendants, plaintiffs

12   are entitled to an order of this Court compelling and ordering defendants to cause the

13   393,333 warrants issued in Goei's name and transferred by him to Evelyn Goei to be

14   transferred to plaintiffs.

15                          **SEVENTH CLAIM FOR RELIEF**

16            **FOR AN ACCOUNTING AGAINST BOTH DEFENDANTS**

17           69.     Plaintiffs repeat and reallege Paragraphs "1" through "68" above as if fully set

18   forth herein.

19           70.     Plaintiffs, as venture capitalists, have invested in other entities besides

20   Cyphermetrix and CypherEdge, and their subsidiaries and affiliates.

21           71.     One of the other entities in which plaintiffs invested was NexusEdge

22   Technologies Sdn Bhd ("NexusEdge Malaysia").

23           72.     On April 19, 2005, NexusEdge Malaysia accused Goei of demanding that it

24   set aside shares of NexusEdge Malaysia for himself and other employees of MSCVC.

25   NexusEdge Malaysia accused Goei of stating that the compensation that he and the

26   employees received from MSCVC was not sufficient, and that they were entitled to be

FOURTH AMENDED COMPLAINT- 22

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
US Bank Centre
1420 5th Ave., Suite 3010
Seattle, WA 98101
206.622.1711

1    rewarded fairly.

2        73.    Goei's demand for stock from NexusEdge Malaysia is consistent with his

3    receipt of the warrants from Farallon.

4        74.    Upon information and belief, while serving as Chief Executive Officer of

5    MSCVC and as a director of MVI, Goei may have engaged in a pattern and practice of

6    demanding stock options, warrants and other compensation for himself and other employees

7    of plaintiffs from entities in which plaintiffs planned to invest or had invested, in

8    contravention of his employment agreement and the fiduciary duty that he owed to plaintiffs.

9        75.    Plaintiffs do not know the amount or extent of stock, options, warrants and

10   other compensation that Goei obtained for himself and other employees of plaintiffs from

11   entities in which plaintiffs planned to invest or had invested, and the extent to which he

12   assigned or transferred such unlawfully obtained assets to his wife, Evelyn Goei.

13       76.    By reason of the foregoing, plaintiffs are entitled to an accounting from Goei

14   and Evelyn Goei of all stock, warrants, options and other compensation that Goei received on

15   behalf of himself (including that held in the name of his wife and other family members) and

16   other employees of plaintiffs from companies in which plaintiffs planned to invest or had

17   invested and which Goei received while, or by reason of, his serving as Chief Executive

18   Officer of MSCVC and a director of MVI. Based upon the results of this accounting, any

19   such stock, warrants, options and other compensation should be transferred to plaintiffs by

20   defendants and/or Goei should be liable in damages for all such assets obtained by him for

21   himself and other employees of plaintiffs and/or Evelyn Goei should be liable in damages for

22   all such assets obtained by her, jointly and severally with Goei.

23

24

25

26

FOURTH AMENDED COMPLAINT- 23

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
US Bank Centre
1420 5th Ave., Suite 3010
Seattle, WA 98101
206.622.1711

## EIGHTH CLAIM FOR RELIEF AGAINST

## DEFENDANT GOEI FOR DECLARATORY RELIEF

77.     Plaintiffs repeat and reallege Paragraphs "1" through "76" above as if fully set forth herein.

78.     It was Goei that recommended to the board of MVI that it invest in Affinity Communications Pte Ltd. ("Affinity"), an entity controlled by Lau Boon Hwee and in which Mr. Lau had been the majority owner.  Goei had been acquainted with Mr. Lau before Goei had become CEO of MSCVC.  MVI used the special purpose vehicle of Primary Edge to acquire Affinity.

79.     As pleaded above, Goei caused Mr. Lau to request a "poison pill" giving Mr. Lau a right to put his shares in Primary Edge to MVI for S $1,200,000.  Upon information and belief, Goei also caused Mr. Lau to request a golden parachute of 18 months' compensation.  These poison pill and golden parachute rights of Mr. Lau would be triggered, inter alia, by Goei leaving the employment of MVI or Primary Edge for any reason (although in fact, Goei was never employed by MVI or by Primary Edge). Goei sought these provisions to give himself bargaining leverage vis a vis MSCVC and making it expensive for MSCVC (as parent of MVI) to discharge him.  By instructing Mr. Lau to make these demands (and then pretending to accede to them), Goei was baldly violating the fiduciary duties that he owed to plaintiffs.

80.     Goei fraudulently represented to the investment committee of MVI that Mr. Lau had demanded the S $1.2 million poison pill and the 18 month golden parachute.  Goei fraudulently omitted to disclose to the investment committee of MVI that Mr. Lau had not originally demanded this poison pill or golden parachute, that he would have accepted MVI's investment in Primary Edge without these conditions and that these terms had been inserted at Goei's request for Goei's personal benefit.  Based on these fraudulent representations and omissions, the investment committee of MVI approved the investment in Primary Edge

FOURTH AMENDED COMPLAINT- 24

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
US Bank Centre
1420 5th Ave., Suite 3010
Seattle, WA 98101
206.622.1711

1   which included the S $1.2 million poison pill or the golden parachute.

2       81.    As further pleaded above, upon information and belief Goei thereafter

3   obtained the agreement from Mr. Lau for Primary Edge, including its subsidiaries to pay

4   kick-backs to Goei and/or accrue kick-backs for him. Upon information and belief, Goei

5   caused plaintiffs to invest more funds in Primary Edge than Lau Boon Hwee had requested

6   so that funds would be available to compensate Goei. In return for this promise of kick-

7   backs, Goei suggested that Mr. Lau have Primary Edge increase the amount of the poison pill

8   and he allowed Mr. Lau to choose the amount of the increased poison pill. Mr. Lau chose to

9   increase the poison pill to S $3,000,000. On behalf of MVI Goei purported to agree to this

10  increase, without the knowledge or consent of the board of directors of MVI. Goei further

11  agreed to Mr. Lau obtaining both the poison pill and the golden parachute without the

12  knowledge or consent of the board of directors or investment committee of MVI. This

13  conduct of Goei further egregiously breached the fiduciary duties that he owed to MSCVC

14  and MVI.

15      82.    In or around May through July 2006, Goei claimed that he had been

16  constructively discharged from MSCVC. Goei informed Mr. Lau of this alleged constructive

17  discharge and purported to resign as Chief Executive Officer of Primary Edge so as to cause

18  Mr. Lau to invoke his poison pill and golden parachute rights. Goei, together with Alan Tan,

19  general counsel of MSCVC, orchestrated a phony negotiation with Mr. Lau. Alan Tan, who

20  had been corrupted by Goei--Goei had caused hundreds of thousands of warrants and options

21  of Cyphermetrix to be issued to Alan Tan--drafted the negotiations between Mr. Lau and

22  himself. In other words, Alan Tan drafted both MVI's offers and Mr. Lau's counter-offers to

23  arrive at a pre-set "compromise" in which MVI would loan an additional $500,000 to

24  Primary Edge and Mr. Lau would be allowed to convert million of dollars of his so-called

25  poison pill rights into equity in Primary Edge, thereby diluting MVI's control. These phony

26  negotiations were undertaken at the direction of Goei. Plaintiffs refused to accede to this so-

FOURTH AMENDED COMPLAINT- 25

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
US Bank Centre
1420 5th Ave., Suite 3010
Seattle, WA 98101
206.622.1711

PDX/116428/151807/SPB/2709323.1

1  called compromise.

2      83.    Primary Edge and its affiliated companies are out of business and are

3  valueless. Mr. Lau has initiated a suit in the High Court of Malaya at Kuala Lumpur,

4  Malaysia against MVI, vide Civil Suit No: D2-22-1207-2006, to recover his alleged poison

5  pill rights.

6      84.    Any and all liability of plaintiffs to Lau Boon Hwee was the direct and

7  proximate result of Goei's blatant and egregious breaches of the fiduciary duties that he

8  owed to MSCVC and MVI. Goei is not only legally responsible to indemnify and hold

9  plaintiffs harmless from any and all liability that they may incur to Lau Boon Hwee, he is

10  legally responsible to indemnify and hold them harmless from any and all costs of defense,

11  including all attorney's fees incurred.

12      85.    The ultimate amount of Goei's liability to plaintiffs cannot be calculated until

13  there is a final adjudication of Mr. Lau's suit against MVI.

14      86.    Upon information and belief, it is Goei's position that he is not liable to

15  indemnify and hold plaintiffs harmless from all liability, and defense, costs, including

16  attorney's fees, incurred by plaintiffs in the suit brought against MVI by Lau Boon Hwee.

17      87.    By reason of the foregoing, there is a live and justiciable controversy,

18  between plaintiffs and Goei, whether Goei is liable to indemnify and hold plaintiff harmless

19  from any and all liability and defense costs including attorney's fees incurred by plaintiffs by

20  reason of the suit brought against plaintiffs by Lau Boon Hwee.

21      88.    Plaintiffs respectfully request that this Court issue a declaratory judgment,

22  adjudging, and declaring that Goei is liable to indemnify and hold plaintiffs harmless from

23  any and all liability and defense costs, including attorney's fees, incurred by plaintiffs by

24  reason of the suit brought against MVI by Lau Boon Hwee.

25

26

FOURTH AMENDED COMPLAINT- 26

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
US Bank Centre
1420 5th Ave., Suite 3010
Seattle, WA 98101
206.622.1711

## NINTH CLAIM FOR

## RELIEF AGAINST DEFENDANT GOEI

89.     Plaintiffs repeat and reallege Paragraphs "1" through "88" above as if fully set forth herein.

90.     When Goei recommended to the Investment Committee of MV1 that MV1 invest $2,000,000 in the Primary Edge/Affinity companies he (a) misrepresented the value of Affinity by representing that Lau Boon Hwee was paying S $600,000 for his co-shareholder's 40% interest in Affinity when he was actually paying S $200,000, thereby overvaluing Affinity by 50%.   Without the knowledge of the Investment Committee of MV1, Goei recommended and allowed MV1 to pay Mr. Lau S $600,000 for this 40% interest, thereby providing him with a S $200,000 profit; (b) misrepresented that Lau Boon Hwee had demanded a poison pill and golden parachute when Goei had suggested these provisions to Mr. Lau; (c) failed to disclose that Affinity's revenues had fallen by approximately ninety (90%) percent; (d) failed to disclose that Affinity was in a highly competitive field and had no proprietary software or any other product to distinguish it from numerous competitors; (e) misrepresented that Affinity was a "China-play" when Affinity's key subsidiary SMSHub had no license to do business in China and virtually all the revenues of Affinity (including its subsidiaries) was derived from Singapore; (f) failed to disclose that Goei had ordered his employees to do little, if any, due diligence; (g) failed to disclose that Affinity had defaulted upon a contract with Keppel Communications Pte Ltd. ("Keppel") to buy back Keppel's shares and that Keppel had sued, or was on the verge of suing, by reason of this breach.  By reason of this obligation, Affinity was insolvent when MV1 invested in it,

FOURTH AMENDED COMPLAINT- 27

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
US Bank Centre
1420 5th Ave., Suite 3010
Seattle, WA  98101
206.622.1711

which Goei failed to disclose to MV1's board of directors and investment committee; (h) Goei failed to disclose that SMSHub had a deficient product. SMSHub was in the business of placing inexpensive telephone calls but there was a tremendous dropped call problem in which approximately half the calls terminated prematurely in the middle of a conversation; (i) Goei failed to disclose that he was allowing his friend Lau Boon Hwee to obtain a salary more than double what he had previously been paid; and, (j) Goei failed to disclose that by reason of all the economic benefits that he provided for no legitimate reason to Lau Boon Hwee, Mr. Lau agreed that SMSHub should accrue S $5,000 a month for the benefit of Goei (and Affinity would also accrue S $5,000 a month for Goei's benefit).

91.    Goei did not obtain proper approval for the investment of the $2,000,000 in Primary Edge/Affinity because (i) of the above pleaded fraudulent misrepresentations and omissions; (ii) of Goei's scheme not to inform Jagdish Dhaliwal, a member of the MV1 Investment Committee about the investment so that Mr. Dhaliwal could not influence the other members of the Investment Committee to vote against this investment. In the absence of a meeting by the Investment Committee, approval by four of the five members of the Investment Committee, when Goei intentionally refused to inform a hostile member of the proposed investment, was not a legitimate approval; and, (iii) even after the Investment Committee "approval," Goei proposed and thereafter agreed to increase the poison pill from S $1,200,000 to S $3,000,000 and to provide Mr. Lau with both a poison pill and a golden parachute, rather than one or the other, without the knowledge or consent of the Investment Committee of MV1. Consequently, Goei agreed to materially worse investment terms without the requisite authorization.

FOURTH AMENDED COMPLAINT- 28

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
US Bank Centre
1420 5th Ave., Suite 3010
Seattle, WA 98101
206.622.1711

92.     Goei had no good faith basis to seek the investment in Primary Edge/Affinity. His principal motivation for the investment in his friend's company is that he expected to be fired from MV1 or/and MSCVC or that his contract would not be renewed by plaintiffs. The real purpose for this investment was to provide Goei with a poison pill to assist his negotiations against plaintiffs when he would be terminated and to provide him with a secret compensation of S $10,000 a month. In breach of the fiduciary duty that he owed to plaintiffs, Goei deceived, misled, and defrauded MV1 into making the $2,000,000 investment in Primary Edge/Affinity. Further, in breach of the fiduciary duty that he owed to plaintiffs, Goei failed to undertake and indeed prevented, the ordinary due diligence and full disclosure to the Investment Committee of the actual facts of the investment.

93.     The entire investment in Primary Edge/Affinity was lost, and all the Primary Edge/Affinity entities are insolvent.

94.     By reason of the aforepleaded misconduct of Goei, plaintiffs have been damaged in the sum of Two Million ($2,000,000) Dollars for which Goei is personally liable.

## TENTH CLAIM FOR

## RELIEF AGAINST DEFENDANT GOEI

95.     Plaintiffs repeat and reallege Paragraphs "1" through "94" above as if fully set forth herein.

96.     Plaintiffs invested One Million, Seven Hundred Fifty Thousand ($1,750,000) Dollars in CypherEdge (including its predecessor, NexusEdge) for development of software products by CypherEdge.

97.     Without knowledge or consent of plaintiffs, in 2006, Goei caused CypherEdge

FOURTH AMENDED COMPLAINT- 29

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
US Bank Centre
1420 5th Ave., Suite 3010
Seattle, WA 98101
206.622.1711

1    (including its predecessor NexusEdge) to loan $1,750,000 to Cosmos.

2        98.    Cosmos became insolvent by 2007 and has no ability to repay the $1,750,000.

3        99.    To pursue their investment in CypherEdge, plaintiffs were obligated to invest

4    an additional $1,750,000 in CypherEdge to replace the funds diverted by Goei.

5        100.    By reason of Goei's diversion of the $1,750,000, in breach of the fiduciary

6    duty he owed plaintiffs, plaintiffs have been damaged in the sum of $1,750,000.

7

8                              **ELEVENTH CLAIM FOR**

9                      **RELIEF AGAINST DEFENDANT GOEI**

10        101.    Plaintiffs repeat and reallege Paragraphs "1" through "100" above as if fully

11    set forth herein.

12        102.    The Investment Committee of MV1 approved the investment of Three Million

13    Dollars ($3,000,000) in IEI China. In connection therewith, MV1 deposited $3,000,000 with

14

15    USR Malaysia.

16        103.    Goei determined not to proceed with the investment in IEI China. Without

17    knowledge or permission of the directors or Investment Committee of MV1, Goei

18    misappropriated the $3,000,000 by providing $2,000,000 to USR Singapore and using the

19    other $1,000,000 to have USR Malaysia purchase a bogus right of first refusal from Cosmos

20    for the purported benefit of USR Singapore.

21

22        104.    USR Singapore has been insolvent since 2006 and none of the funds are

23    recoverable from it. Cosmos too became insolvent by 2007 and the $1,000,000 is not

24    recoverable from it.

25        105.    This misappropriation by Goei was in breach of the fiduciary duty he owed

26

FOURTH AMENDED COMPLAINT- 30

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
US Bank Centre
1420 5th Ave., Suite 3010
Seattle, WA 98101
206.622.1711

1    plaintiffs.

2    106.    By reason of Goei's misappropriation of the funds explicitly designated for

3    investment in IEI China, plaintiffs have been damaged on the amount of Three Million

4    ($3,000,000) Dollars.

5                        **TWELFTH CLAIM FOR**

6                        **RELIEF AGAINST DEFENDANT GOEI**

7

8    107.    Plaintiffs repeat and reallege Paragraphs "1" through "106" above as if fully

9    set forth herein.

10    108.    MV1 invested $4,000,000 for the benefit of Infosation to pursue a business

11    plan approved by its Investment Committee.

12    109.    Of the funds MV1 invested in Infosation, Goei diverted $2,750,000 to

13    Cosmos.  Goei caused $1,750,000 of Infosation funds to be loaned to Cosmos and used

14    $1,000,000 held for the benefit of Infosation by its corporate parent, to buy a bogus right of

15

16    first refusal from Cosmos.

17    110.    This diversion of $2,750,000 of plaintiffs' funds designated for the

18    implementation of the business plan of Infosation was done without the knowledge or

19    consent of plaintiffs.

20    111.    By reason of this diversion of funds, Goei breached the fiduciary duty that he

21    owed to plaintiffs.

22

23    112.    Cosmos was insolvent by 2007 and has no ability to repay the

24    misappropriated $2,750,000 to plaintiffs.

25    113.    By reason of Goei's breach of fiduciary duty, plaintiffs have been damaged in

26

FOURTH AMENDED COMPLAINT- 31

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
US Bank Centre
1420 5th Ave., Suite 3010
Seattle, WA 98101
206.822.1711

1  the amount of Two Million Seven Hundred Fifty Thousand ($2,750,000) Dollars.

2                    **PRAYER FOR RELIEF**

3       WHEREFORE, plaintiffs MSC Venture Corporation Sdn Bhd and MSC Venture One

4  Sdn Bhd demand judgment against the defendants as follows:

5            i.      Upon the First, Second and Third Claims for Relief against defendant

6  Esmond Goei damages of Seventeen Million Three Hundred Sixty Thousand Dollars

7  ($17,360,000), together with interest accrued thereupon;

8            ii.     On the Fourth Claim For Relief, that plaintiffs recover damages

9  against defendant Esmond Goei in the amount of One Million ($1,000,000) Dollars;

10           iii.    On the Fifth Claim for Relief, that plaintiffs recover damages against

11  defendants Esmond Goei and Evelyn Goei, jointly and severally, in the amount of One

12  Million ($1,000,000) Dollars;

13           iv.     On the Sixth Claim for Relief, that this Court order and compel

14  defendants Esmond Goei and Evelyn Goei to cause the 393,333 warrants issued in Goei's

15  name and transferred to Evelyn Goei to be transferred to plaintiffs;

16           v.      On the Seventh Claim for Relief, that this Court order an accounting

17  from Goei and Evelyn Goei of all stock warrants, options and other compensation that Goei

18  received on behalf of himself (including that held in the name of his wife and other family

19  members) and other employees of plaintiffs from companies in which plaintiffs planned to

20  invest or had invested, and which Goei acquired while, or by reason of, his serving as Chief

21  Executive Officer of MSCVC and a director of MVI and based upon the results of this

22  accounting, any such stock, warrants, options and other compensation should be transferred

23  to plaintiffs by defendants and/or Goei should be liable in damages for all such assets

24  obtained by him for himself and other employees of plaintiffs and/or Evelyn Goei should be

25  liable in damages for all such assets obtained by her, jointly and severally with Goei;

26

FOURTH AMENDED COMPLAINT- 32

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
US Bank Centre
1420 5th Ave., Suite 3010
Seattle, WA 98101
206.622.1711

1           vi.     On the Eighth Claim for Relief, that this Court issue a declaratory

2  judgment, adjudging, and declaring that Goei is liable to indemnify and hold plaintiffs

3  harmless from any and all liability and defense costs, including attorney's fees, incurred by

4  plaintiffs by reason of the suit brought against MVI by Lau Boon Hwee;

5           vii.    On the Ninth Claim for Relief, that plaintiffs recover damages against

6  defendant Esmond Goei in the amount of Two Million ($2,000,000) Dollars;

7           viii.   On the Tenth Claim for Relief that plaintiffs recover damages against

8  defendant Esmond Goei in the amount of One Million Seven Hundred Fifty Thousand

9  ($1,750,000) Dollars;

10          ix.     On the Eleventh Claim for Relief that plaintiffs recover damages

11  against defendant Esmond Goei in the amount of Three Million ($3,000,000) Dollars;

12          x.     On the Twelfth Claim for Relief that plaintiffs recover damages

13  against defendant Esmond Goei in the amount of Two Million Seven Hundred Fifty

14  Thousand ($2,750,000) Dollars;

15          xi.     The costs and expenses of this action, including reasonable attorneys'

16  fees; and,

17       Such other and further relief as this Court deems necessary and just in the

18  circumstances.

19       Dated this 18th day of February, 2009.

20                          SCHWABE, WILLIAMSON & WYATT, P.C.

21

22                 By:   s/Stephanie P. Berntsen

23                      Stephanie P. Berntsen, WSBA #33072
                             Matthew Turetsky, WSBA #23611

24                      1420 Fifth Avenue, Suite 3010
                             Seattle, WA 98101-2393

25                      Telephone: (206) 622-1711
                             Facsimile: (206) 292-0460

26                      *Attorneys for Plaintiffs MSC Venture*
                             *Corp. Sdn Bhd and MSC Venture One Sdn*

FOURTH AMENDED COMPLAINT- 33

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
US Bank Centre
1420 5th Ave., Suite 3010
Seattle, WA  98101
206.622.1711

*Bhd and Third-Party Defendants*
*CYPHERMETRIX, INC., and*
*CYPHEREDGE TECHNOLOGIES, INC.*

HOFHEIMER GARTLIR & GROSS, LLP
Craig Weiner, NYBA #2468239
Douglas Gross, NYBA #1727155
530 Fifth Avenue, 9th Floor
New York, New York 10036
Telephone: (212) 818-9000
Facsimile: (212) 869-4930
*Attorneys for Plaintiffs MSC Venture*
*Corp. Sdn Bhd and MSC Venture One Sdn*
*Bhd and Third-Party Defendants*
*CYPHERMETRIX, INC., and*
*CYPHEREDGE TECHNOLOGIES, INC.*

//
//
//
//
//
//

FOURTH AMENDED COMPLAINT- 34

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
US Bank Centre
1420 5th Ave., Suite 3010
Seattle, WA 98101
206.622.1711

PDX/116428/151807/SPB/2709323.1

1

2

## CERTIFICATE OF SERVICE

3    I hereby certify that on the 18th day of February 2009, I caused to be served the

4  foregoing *Fourth Amended Complaint* on the following parties at the following addresses:

5

| John H. Chun | Benjamin J. Stone |
|---|---|
| Denise L. Ashbaugh | Cozen O'Connor |
| Summit Law Group | Washington Mutual Tower |
| 315 Fifth Avenue South, Suite 1000 | 1201 Third Ave Ste 5200 |
| Seattle WA 98104 | Seattle WA 98101-3071 |
| Telephone:     (206) 676-7000 | Telephone:     (206) 340-1000 |
| Facsimile:     (206) 676-7001 | Facsimile:     (206) 621-8783 |
| E-mail:     johnc@summitlaw.com | E-mail:     BStone@cozen.com |
| E-mail:     denisea@summitlaw.com | |

6

7

8

9

10

11  by:

12  ☐ U.S. Postal Service, ordinary first class mail
     ☐ U.S. Postal Service, certified or registered mail,
     return receipt requested

13  ☐ hand delivery
     ☐ facsimile

14  ☒ electronic service through the Court's CM/ECF electronic system
     ☐ other (specify) _____

15

16

17                          s/ Stephanie P. Berntsen
                            Stephanie P. Berntsen

18

19

20

21

22

23

24

25

26

CERTIFICATE OF SERVICE - 1

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
US Bank Centre
1420 5th Ave., Suite 3010
Seattle, WA  98101
206.622.1711

PDX/116428/151807/SPB/2709323.1