UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| MSC VENTURE CORP., SDN BHD and MSC VENTURE ONE SDN BHD,<br><br>Plaintiffs,<br><br>v.<br><br>ESMOND GOEI,<br><br>Defendant. | CASE NO. C06-1731RSM<br><br>ORDER ON MOTION FOR PARTIAL SUMMARY JUDGMENT |
| ESMOND GOEI,<br><br>Third-Party Plaintiff,<br><br>v.<br><br>CYPHERMETRIX, INC., a Delaware corporation, et al.,<br><br>Third-Party Defendants. | |

This matter is before the Court for consideration of plaintiffs' motion for partial summary judgment. Dkt. # 109. Defendants have opposed the motion and have moved to strike designated portions of plaintiffs' supporting exhibits. Dkt. # 113. After thorough consideration of the parties'

ORDER - 1

memoranda and supporting declarations and exhibits, the Court shall, for the reasons set forth below, deny plaintiffs' motion for partial summary judgment, and deny defendants' motion to strike.

## FACTUAL BACKGROUND

The plaintiffs MSC Venture Corp. ("MSCVC") and MSC Venture One Sdn Bhd (MV1) are Malaysian venture capital corporations, owned by Multimedia Development Corporation, which is itself owned entirely by the Malaysian state treasury. Gross Dec., Ex. P at 2. MSCVC and MV1 maintain wholly owned subsidiaries, CypherEdge and Cyphermetrix, two corporations with their principal place of business in Bellevue, Washington. Plaintiffs' Motion at 2, 8.

In August 2003, the defendant Esmond Goei was hired as the Chief Executive Officer of MSCVC. Goei Dec. at ¶ 3. In October 2003, he was appointed as director to the boards of MSCVC and MV1. *Id.* He served in these positions until 2006. Plaintiffs' motion at 2.

The Plaintiffs complaint asserts a number of causes of action against Goei and his wife. The Plaintiffs' Motion for Partial Summary Judgment concentrates on the complaint's ninth claim for relief, a cause of action for breach of fiduciary duty. According to the plaintiffs' version of the events with respect to this single cause of action, Goei abused his fiduciary duties to the plaintiff corporations.

In late 2004, the plaintiffs invested $2 million in Affinity Companies, a group of telecom companies, that belonged in part to Goei's friend, Lau Boon Hwee. Goei was instrumental in encouraging and orchestrating the investment. The plaintiffs allege that, in doing so, he acted in bad faith and with ulterior motives, in violation of his duties.

According to the plaintiffs, in a November 2004 MSN instant message conversation, Goei instructed plaintiffs' employees to conduct little or no due diligence before consummating the Affinity Companies investment. Gross Dec., Ex. I, at P23999; 24011. He knew that due diligence would reveal that the Affinity Companies were insolvent or nearly insolvent, and that their flagship company, SMShub, had severe technological and regulatory defects. Amin Dec. at ¶ 6. SMShub's primary proprietary asset was an internet-based phone service, but the service dropped more than half its calls and was illegal in China. Goei failed to disclose and deliberately hid these facts from the plaintiffs' boards.

The plaintiffs further maintain that Goei inflated the value of Affinity Companies, overstating by

ORDER - 2

50% the sum necessary to buy out Lau Boon Hwee's partner, Teo Hock Boon. Gross Dec., Ex. F 19:13-24. The Investment Committee believed the partner would receive 600,000 Singaporean dollars for his 40% interest in the Affinity Companies. Actually, as Goei knew, Teo Hock Boon was to receive S$400,000. See Gross Dec., Ex. G. Around this time, Goei instructed Syed Izmi Bin Kamarul Bahrin ("Izmi"), MSCVC's Chief Financial Officer, not to obtain a copy of the contract between Lau Boon Hwee and Teo Hock Boon. Goei thus withheld this information from the plaintiffs and permitted Lau Boon Hwee to skim off the excess S$200,000. Gross Dec., Ex. F at 19:27-28; Izmi Dec. ¶ 10.

To acquire Affinity Companies, the plaintiffs formed a joint venture corporation, Primary Edge Technology Sdn Bhd ("PET"), in which Lau Boon Hwee was to become a minority shareholder. The plaintiffs allege that, in structuring this arrangement, Goei proposed the idea of a "poison pill." Izmi Dec. ¶ 4; Shafie Dec. at ¶ 5. The poison pill provided that, if Goei left MSCVC for any reason, Lau Boon Hwee was entitled to sell his minority share in PET back to the plaintiffs for more than its fair value. This pill provision was originally valued at $1.2 million. According to the plaintiffs, the pill served no commercial purpose and was commercially unreasonable. Gross Dec., Ex. P. Lau Boon Hwee had little to no bargaining leverage; his companies were nearly insolvent and his technology was failing. Rather than serve a commercial purpose, the pill served to provide Goei, who feared he would be fired, with personal job security. Gross Dec., Ex. C at 26599; Ex. D. It also served as part of a quid pro quo arrangement between Goei and Lau Boon Hwee.

In December 2004, Goei instructed MSCVC's head counsel Alan Tan to draft an Approval Memorandum that included many of these misrepresentations. Gross Dec., Ex. G; Izmi Dec. ¶ 12. The memorandum was circulated to all but one member of the five-person MSCVC Investment Committee. *Id.* Under MSCVC's corporate bylaws, investments had to be approved by the five-member Investment Committee. The plaintiffs allege that unanimous Committee approval was necessary for an investment when no formal meeting is held. Gross Dec., Ex. K, at ¶ 48; Ex. J at 77:18-25. In this instance, just four of the five members of the Committee signaled their approval by signing the memorandum. Gross Dec., Ex. G at P000067540. The plaintiffs argue that Goei purposefully excluded Jagdish Dhaliwal, the fifth member, from the approval process, because he knew Dhaliwal would have been hostile to the

ORDER - 3

investment. See Gross Dec., Ex I, at P24005 (Goei wanted to avoid the "chance that [the deal] blows up in our face if Jag[dish Dhaliwal] gets nasty.") Thus, Dhaliwal never received the memorandum. *Id.*, Ex. J at 102:8-13. Despite this invalid approval, the investment went ahead.

The plaintiffs allege that soon thereafter and unbeknownst to them, Goei instigated an increase of the poison pill provision from $1.2 million to $3 million. Izmi Dec. at ¶ 15. He also guaranteed Lau Boon Hwee a golden parachute of 18 months salary, and more than doubled his salary. *Id.*; Ex. F at 40:1-9. At the same time, Goei entered into a secret "kickback arrangement" with Lau Boon Hwee that provided Goei at least $5000 per month. Gross Dec. at ¶ 18; Ex. F at 111:25-30. These arrangements were never approved by the plaintiffs and were diametrically opposed to their interests. When Goei's relationship with the plaintiffs terminated, he encouraged Lau Boon Hwee to exercise his rights under the poison pill.

Finally, the plaintiffs allege that Goei believed that he was underpaid as CEO of MSCVC and as director of MSCVC and MV1. Because corporate corruption was rampant in Malaysia, he believed he was entitled to kickbacks and other illicit money.

Based on the above version of events, the plaintiffs now move for partial summary judgment. Although, such summary judgment would leave other plaintiff claims outstanding, the plaintiffs claim that, should they prevail on this motion, they will discontinue their remaining claims against Goei, cause the third party defendants (which are their subsidiaries) to discontinue their counterclaims, and thus terminate the litigation. Plaintiffs' motion at 1-2.

## DISCUSSION

### I. Motion to Strike

Goei moves to strike exhibits C, D, F, H, I, K, L, M, O, P, Q, S, T, U, V, W, X, Y, Z, AA, CC, DD, FF, HH, II, and KK, to Attorney Gross's declaration as unauthenticated, inadmissible hearsay, or otherwise inadmissible. The Court has considered these exhibits for the purpose of ruling on the motion for Partial Summary Judgment. The motion to strike is denied, without prejudice to renewal as a motion in limine.

### II. Summary judgment standard

ORDER - 4

Summary judgment is proper where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute about a material fact is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* In conducting this analysis, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255; *United States v. Johnson Controls, Inc.*, 457 F.3d 1009, 1013 (9th Cir. 2005).

### III. Analysis

**A. Washington Corporate Law controls.**

The events and transactions at issue in this motion occurred in Malaysia, and may be governed by Malaysian corporate law. When sitting in diversity, the court "must apply the conflict-of-laws-rules of the state in which the federal court is located" to determine which jurisdiction's laws apply. *Amer. Triticale, Inc. v. Nytco Servs., Inc.*, 664 F.2d 1136, 1141 (9th Cir. 1981). Under Washington law:

> Before a court will conduct a conflict of law analysis, the party seeking to apply foreign law must show that an actual conflict exists between the presumptive Washington law and the law of the foreign state. An actual conflict exists if the two states' laws produce different results on a legal issue. If applying the two states' laws would produce the same result, there is a "false conflict" and Washington law will presumptively apply.

*Alaska Nat. Ins. Co. v. Bryan*, 125 Wash.App. 24, 30 (2004) (citations omitted).

In determining the law of a foreign jurisdiction, "the court may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence." Fed. R. Civ. P. 44.1. The plaintiffs offer the opinion of J. Wilfred Durai, a New York attorney with relevant expertise, as to the substance of Malaysian corporate law. The defendant does not challenge the substance of that opinion. For purposes of this motion, the court accepts his characterization and description as valid.

Malaysian corporate law, like Washington corporate law, is derived from both statutory and common law. Under applicable statutes, a director must "exercise his powers for a proper purpose and in good faith in the best interests of the company." *Id.* at 7. At common law, a director of a corporation

ORDER - 5

has a fiduciary duty to a) "act in what he honestly considers to be the company's interest"; b) avoid conflicts of interest; and c) use his powers for proper and not collateral purposes. Gross Dec., Ex. OO, at 2.[1]

Washington statutory law provides for the standard of care that officers and directors owe. RCWA 23B.08.300; 23B.08.420. A director or officer must act a) in good faith, b) with the care of an ordinarily prudent person, and c) in a manner he or she reasonably believes to be in the best interests of the corporation. *Id.* At common law, courts have interpreted this language to mean a fiduciary must act "'primarily' for the benefit of the other, which includes keeping the interests of the other foremost in mind (through loyalty and full disclosure) and acting with care." *Van Noy v. State Farm Mut. Auto. Ins. Co.*, 142 Wash.2d 784, 797-98, 16 P.3d 574 (2001). To this end, the fiduciary may not "directly or indirectly acquire a profit for themselves or acquire any other personal advantage in dealings with others on behalf of the corporation." *Hayes Oyster Co.*, 64 Wash.2d at 381.

Although the language of Malaysian law varies from that of Washington law, the difference is insignificant. Principally, both require the officer to act a) in good faith; b) in what he reasonably believes to be the best interests of the corporation; and c) with no ulterior motive. For the limited purpose of this motion, applying Malaysian law to these facts would yield the same result as would applying Washington law.[2] There is a "false conflict." Therefore, Washington law applies.

**B. There are genuine disputes of material fact with respect to three of the four elements in the Plaintiffs' action for breach of fiduciary duty.**

To establish a breach of a fiduciary duty under Washington law, "the plaintiff[s] must prove (1) existence of a duty owed, (2) breach of that duty, (3) resulting injury, and (4) that the claimed breach proximately caused the injury." *Micro Enhancement Int'l, Inc. V. Coopers & Lybrand, LLP*, 110 Wash. App. 412, 433-34 (2002).

---

[1]Presumably, the same standard applies to officers as to directors. However, the plaintiffs' expert opinion, Ex. OO, and the excerpts of Malaysian statutes refer only to "directors."

[2]It is possible that, given the complexity of the complaint, conflicts between the law of Malaysia and law of Washington may yield different results in other factual circumstances or on other causes of action.

ORDER - 6

**1) There is no genuine dispute with respect to the existence of a duty owed.**

It is undisputed that, as an officer of MSCVC, and as a director of MV1 and MSCVC, Goei necessarily owed a fiduciary duty to each plaintiff. *See State ex rel. Hayes Oyster Co. v. Keypoint Oyster Co.*, 64 Wash.2d 375, 391 P.2d 979 (1964).

**2) There are genuine disputes of material issues with respect to whether Goei breached his duty.**

Washington Statutory law provides for the general standard of care that officers and directors owe. RCWA 23B.08.300; 23B.08.420. A director or officer must act a) in good faith, b) with the care of an ordinarily prudent person, and c) in a manner he or she reasonably believes to be in the best interests of the corporation. *Id.* Courts have interpreted this language to mean a fiduciary must act "'primarily' for the benefit of the other, which includes keeping the interests of the other foremost in mind (through loyalty and full disclosure) and acting with care." *Van Noy v. State Farm Mut. Auto. Ins. Co.*, 142 Wash.2d 784, 797-98, 16 P.3d 574 (2001). To this end, the fiduciary may not "directly or indirectly acquire a profit for themselves or acquire any other personal advantage in dealings with others on behalf of the corporation." *Hayes Oyster Co.*, 64 Wash.2d at 381.

The central issue is thus whether Goei pursued investments in Lau Boon Hwee's companies in what he in good faith, prudently, honestly, and reasonably believed to be the best interests of MSCVC and MV1, or whether he pursued the investments to promote his self-interest.

Goei denies that he acted in self-interest. The plaintiffs are correct that a conclusory denial will not alone suffice to resist summary judgment, where undisputed documentary evidence demonstrates the meritlessness of that denial. *See Anheuser-Busch, Inc. V. Natural Beverage Dists.*, 69 F.3d 337, 345 (9th Cir. 1995). Nevertheless, viewing the evidence in the light most favorable to Goei, there are genuine disputes about many material facts. There are disputes regarding:

*a) Whether Goei instructed Izmi and Tan to conduct little or no due diligence before agreeing to the terms of investment with Lau Boon Hwee.*

In an MSN instant message conversation held before the plaintiff's investment, Goei instructed Izmi, Tan, and others not to "go overboard on DD [due diligence]." Shafie Dec. At 3, ¶ 6; Ex. I to Gross Dec. at P0024011. He also warned them that "if we take too long doing due dili[gence] I feel that it will

ORDER - 7

create more risk to the deal." *Id.* At P0023999. Viewed in the light most favorable to Goei, these statements are consistent with his claim that, although he wanted Izmi and Tan to conduct all the due diligence that was necessary, MSCVC had a history of "overblown" due diligence, and in this instance, Goei believed that needless delay threatened the deal. Goei at 3, ¶ 9.

*b) Whether Goei failed to inform the plaintiffs that Lau Boon Hwee's companies were near insolvency.*

Goei denies that Lau Boon Hwee's businesses were near insolvency, alleging that they were not in "dismal condition." Goei Dec. at 3, ¶ 10. Furthermore, full due diligence would not have demonstrated that they were. *Id.* Others hold similar views. Alan Tan "vaguely recall[s] that [Lau Boon Hwee] needed funds to expand," but suggests that the companies were not near insolvency. Chun Dec., Ex. A at 30:3. Lau Boon Hwee claims that the companies were not insolvent, and were "still running," prior to MSCVC's investment. Chun Dec., Ex. F at 116:27-28.

*c) Whether Goei failed to inform the plaintiffs of SMShub's "severe technological and regulatory" problems.*

According to Goei, "it was revealed that SMShub was just starting out and in a test marketing phase that had quickly accelerated beyond the capacity of the technology developed." Goei at ¶ 11. Thus, the plaintiffs were aware of SMShub's technological shortcomings, and invested in spite of them, on the belief that the technology had great future potential. *Id.* Further, it was "known" that SMShub lacked a permit to conduct a telecom business in China. *Id.* The severity of the technology's shortcomings are also in dispute. Shafie alleges that half his telephone calls were dropped, (Shafie at ¶ 6.d), but Goei insists the dropped call rate was not so severe. Goei at ¶ 15.

*d) Whether Goei proposed the "poison pill."*

In his declaration, Goei states that he provided guidance to Izmi and Tan regarding negotiations with Lau Boon Hwee, but he recused himself from the actual negotiating team in order to avoid the appearance of impropriety. Goei at ¶ 14. He did not propose the "poison pill" concept, but provided a technical name for the demands Lau Boon Hwee had already expressed. *Id.*, at ¶ 14.

Lau Boon Hwee claims that it was his idea to protect himself against Goei's departure from MSCVC. Chun Dec., Ex. H at 3:7-8 (Lau Boon Hwee dep.). He therefore "specifically negotiated for

ORDER - 8

the inclusion" of the poison pill. Chun Dec., Ex. DD at ¶ 3.4. Dhaliwal also states that Lau Boon Hwee "negotiated for the insertion of a 'poison pill.'" Chun Dec., Ex. X, at ¶ 5.7. Furthermore, Lau Boon Hwee may have had a legitimate reason to demand the pill. He wished to avoid repeating a prior business experience in which a CEO left and Lau Boon Hwee had difficulty cooperating with remaining management. Chun Dec., Ex. DD at ¶ 3.4.

*e) Whether, at the time the poison pill was designed, Goei believed he would be fired.*

Goei claims he had little reason to believe his job was in danger. He had received excellent reviews from the MSCVC chairman of the board, Datuk Arif, for the years 2003 and 2004. Goei at 4, ¶ 16. In November 2005, Arif "strongly affirmed his intention to renew"Goei's management contract. *Id.*

*f) Whether Lau Boon Hwee had bargaining leverage to obtain the poison pill.*

According to Alan Tan, Lau Boon Hwee and MSCVC were evenly matched negotiators. Chun Dec., Ex. A at 20: 10-13 (Tan Dep.). The process was a "give and take"; although the poison pill was the "gift part" of the process, MSCVC "succeed[ed] in investing in Lau Boon Hwee's company." *Id.* At 25:24-25. Furthermore, the strength of Lau Boon Hwee's bargaining leverage was largely dependant on other disputed facts: the quality of the companies' technology and its financial solvency.

*g) Whether the poison pill was commercially unreasonable.*

Goei admits that similar poison pills are unusual. See Ex. Q (it is "not usual to see these items in a venture deal"). It does not follow that such a provision is per se unreasonable. Here, Goei argues that MSCVC and MV1 potentially stood to profit, despite the heavy downside of the provision. Goei Dec. at ¶ 24. The reasonableness of this proposition depends in large part on the negotiating power of each party. *See supra* III(B)(2)(f).

Furthermore, Lau Boon Hwee may have had legitimate reasons to pursue the poison pill. He wished to protect his business, and had a history of deals gone bad after his contact in the cooperating corporation left. Chun Dec., Ex. DD at ¶ 3.4. He believed that Goei would be instrumental to MSCVC's potential success, and wanted to continue their good working relationship. *Id.*

*h) Whether plaintiffs' investments could be approved only by unanimous consent of the Investment Committee.*

ORDER - 9

Goei alleges that, under the unanimous directive of the Plaintiffs' Board, the Investment Committee had the power to approve investments by a simple majority vote. Goei at ¶ 25. Supporting his contention are MV1's board minutes from January 27, 2004. See Gross Dec., Ex. O at P012748. The Minutes state that "any investments above RM 12.0 million would be approved by MV1 board so long as a simple majority is obtained." At the prevailing rate of .275 US dollars to the Malaysian Ringgit, 12 million ringgits is worth about 3.3 million dollars. The investment here was 2 million dollars. One would assume that investments under the RM 12 million threshold demand, if anything, lesser approval oversight. However, the minutes are vague as to the voting requirements for investments below RM 12.0 million. *Id.* Therefore, there is a material dispute as to whether unanimous Committee support was necessary. Four of the five members of the Investment Committee approved, but the fifth did not. Therefore, there is a dispute as to whether Goei failed to obtain "approval" of the Lau Boon Hwee investment.

*i) Whether Goei excluded Dhaliwal from the Investment Committee's decision process.*

Goei denies that he purposefully excluded Dhaliwal, asserting that Dhaliwal had an opportunity to object. Goei at ¶¶ 19, 25. It is also unclear whether Dhaliwal was actually excluded. He admits that he was aware of investments in Lau Boon Hwee's companies, and was aware that "certain approvals had been obtained." Chun Dec., Ex. D at 109:19-22. Although the investments "had not contained [his] signature," he "let them go through." *Id.* at 109:23 - 110:2.

*j) Whether Goei instigated the modification of the poison pill so as to provide $3 million rather than the $1.2 million to which Lau Boon Hwee originally agreed.*

Goei denies that he instigated the increase. Goei Dec. at ¶ 26. Alan Tan cannot recall how the agreement was modified, but asserts that "it's not uncommon for sometimes the proposal paper that goes to the board or the investment committee to have adjustments made to it later on." Chun Dec., Ex. A at 40:20-22.

*k) Whether, after his termination, Goei encouraged Lau Boon Hwee to exercise his contractual rights under the poison pill.*

Goei claims that he neither assisted nor encouraged Lau Boon Hwee to trigger the poison pill

ORDER - 10

rights. Goei Dec. ¶ 33. Rather, he discouraged Lau Boon Hwee from triggering the rights. *Id.* Lau Boon Hwee corroborates this version, claiming that he looked out for his "personal interest." Chun Dec., Ex. F at 145-46 (Lau Boon Hwee).

*l) Whether Goei had a secret agreement to split proceeds with Lau Boon Hwee.*

The plaintiffs present only circumstantial evidence to suggest the existence of such an agreement. Both Goei and Lau Boon Hwee deny it. Goei Dec. at ¶ 20.

*m) Whether Goei believed he was underpaid and therefore entitled to kickbacks.*

Goei admits that he felt underpaid, but this feeling stemmed from the plaintiffs' failure to reimburse him for office and support staff costs. Goei Dec. at ¶ 20. Most importantly, he did not believe the underpayment entitled him to kickbacks. *Id.* Although he believed corruption to be rampant in Malaysia, he did not feel entitled to act corruptly. Goei Dec. at ¶ 36.

*n) Whether Goei's unilateral decision to increase Lau Boon Hwee's salary increase was commercially unusual.*

Goei admits that he authorized a salary raise for Lau Boon Hwee, but insists such a raise is not unusual following an investment. Goei at ¶ 30.

*o) Whether Goei reasonably relied on legal advice from Alan Tan.*

In discharging his fiduciary duties, an officer or director may rely on "[l]egal counsel ... as to matters the director reasonably believes are within the person's professional or expert competence." RCW 23B.08.300(2)(b). Goei claims he relied on Alan Tan's advice with respect to all legal matters at MSCVC, including those that concerned the Affinity Companies and PET. Goei Dec. at ¶ 9. Goei's belief in the advice may have been reasonable, because Tan graduated law school, was an experienced corporate lawyer, and was head of corporate counsel since 2003. Chun Dec., Ex. A at 191:18-193:27; 4:15, 4:26-31 (A. Tan. Dep.).

Only one undisputed material fact suggests that Goei breached his fiduciary duties. The plaintiffs paid S$600,000 for Teo Hock Boon's 40% share of the Affinity Companies. Goei does not deny that he was aware that Teo Hock Boon actually received S$400,000 and that Lau Boon Hwee pocketed the excess S$200,000.

ORDER - 11

**3) There are genuine disputes of material fact with respect to the resulting injury.**

There are genuine issues of material fact with respect to:

*a) The actual value of Affinity Companies.*

The plaintiffs request relief for the entire $2 million investment in Affinity Companies. However, they admit that "it would have been reasonable to pay S$1,500,000 for Affinity." Gross Dec. At ¶ 6a.

*b) Whether the plaintiffs failed to mitigate damages by refusing to accept a settlement in lieu of Lau Boon Hwee's poison pill payout.*

Under the law of torts and contracts, an injured party has an obligation to mitigate his or her damages in order to prevent "recovery for those damages the injured party could have avoided by reasonable efforts taken after the wrong was committed." *Bernsen v. Big Bend Elec. Co-op., Inc.*, 68 Wash.App. 427, 842 P.2d 1047 (Div. 3, 1993). According to MSCVC Board papers, Lau Boon Hwee was willing to forego his contractual rights under the poison pill in exchange for a "bridging loan" of S$500,000 and S$2.75 million in shares. Chun Dec, Ex. S at P0051750. The plaintiffs subsequently refused the settlement, and Lau Boon Hwee sued to recover the entire $3 million. Goei alleges that, although the settlement would have diluted the plaintiffs' interest in Lau Boon Hwee's companies, it would have diminished or eliminated much of the damages. Motion in opposition at 23.

**4) There are genuine disputes of material issues with respect to whether the claimed breach proximately caused the injury.**

To establish proximate cause, the plaintiffs must establish that the damages would not have occurred but for the defendant's wrongdoing. *Schmalenberg v. Tacoma News, Inc.*, 87 Wash. App. 579, 593-95 (1997). They have not done so, as there are genuine issues of material fact with respect to:

*a) Whether the plaintiffs would have invested in the Affinity companies but for Goei's breach.*

With the exception of Goei, the Investment Committee contained four members. Three approved of the investment in Lau Boon Hwee's companies. The fourth was aware of the investment and "let it through." Gross Dec., Ex. D. at 110:2. Depending on the nature of Goei's breach, it is plausible that the investment would have occurred even without Goei's breach.

*b) Whether the plaintiffs would have spent S$600,000 to buy out Teo Hock Boon's S$400,000 share but*

ORDER - 12

*for Goei's breach.*

Goei does not directly address the plaintiffs' allegation that he failed to disclose that Lau Boon Hwee bought Teo Hock Boon's minority share in Affinity Companies for S$400,000 and then sold it to MSCVC for S$600,000. Nor does Goei address the allegation that he permitted Lau Boon Hwee to pocket the excess S$200,000. For this reason, the plaintiffs allege that it is "particularly clear that Goei should be held liable for S$200,000 of the" initial $2 million investment. Plaintiffs' motion at 16.

However, it is possible that the plaintiffs would have invested this excess S$200,000 even if Goei had disclosed the true nature of the deal. At his deposition, Lau Boon Hwee stated that, before the investment, "not only Esmond Goei but Izmi and Alan Tan is aware" of the S$200,000 discrepancy. Gross Dec., Ex. F at 19:19-20. He also stated that he deserved the excess money "because that was my 16 years of effort to the whole company." *Id.* at 19:28. It is unclear from this record whether Dhaliwal and the other remaining members of the investment Committee were also aware of the discrepancy, but Lau Boon Hwee's statements suggest that the structure of the transaction was relatively transparent.

*c) whether the plaintiffs would have included the poison pill but for Goei's breach.*

Lau Boon Hwee is adamant that he "specifically negotiated" for the poison pill. Chun Dec., Ex. DD at ¶ 3.4. Others assert that Lau Boon Hwee was a tough negotiator who feared he was being taken advantage of. Chun Dec., Ex. A at 20: 10-13   The late modification of the poison pill terms was "not uncommon." *Id.* at 40:20-22.

**5) There are genuine disputes of material fact with respect to whether the Plaintiffs' action is barred by the statute of limitations.**

In Washington, the limitations period for a claim for breach of a fiduciary duty such as this is three years. *See* RCW 4.16.080(2); *Mayer v. Huesner*, 126 Wash. App. 114, 123 (2005). "Generally, the statute of limitations accrues when a party has 'the right to apply to a court for relief.'" *Mayer*, 126 Wash. App. at 123 (quoting *Gazija v. Nicholas Jerns Co.*, 86 Wash.2d 215, 219, 543 P.2d 338 (1975).

Goei argues that the alleged wrongful conduct at issue in this motion—the bad faith inducement to invest in Affinity Companies, the unreasonable poison pill provision, and so on—occurred in late 2004. Defendants' Opposition at 23. The plaintiffs' right to apply for relief accrued at that time. However,

ORDER - 13

they did not apply for relief until their Second Amended Complaint, dated June 12, 2008, more than 3 years after the wrongful conduct. See Dkt. #73 at 8-9. The Plaintiffs' first complaint concerned wrongful transactions that Goei orchestrated between the plaintiffs' and subsidiaries in Bellevue, Washington—transactions unrelated to the transactions at issue on this motion. Therefore, the factual claims with respect to Goei's involvement in the Affinity Companies probably did not "relate back" to the allegations of fiduciary malfeasance in the first Complaint, because they did not arise "out of the same conduct, transaction, or occurrence set out" in the Plaintiffs' first Complaint. Fed R. Civ. P. 15(c)(1)(B).

However, "[u]nder the discovery rule, a cause of action accrues when the plaintiff knew or should have known the essential elements of the cause of action." *Allen v. State*, 118 Wash.2d 753, 757-58, 826 P.2d 200 (1992). The discovery rule tolls the statute of limitations "until the time when a plaintiff, through the exercise of due diligence, should have discovered the basis for a cause of action." *Id.* at 758, 826 P.2d 200.

Central to the Plaintiffs' claim is that Goei purposefully deceived the plaintiffs' boards, and withheld information with respect to, for instance, the solvency of the Affinity Companies, the terms of the poison pill provision, and the extent to which Goei instructed other to conduct due diligence. Under their theory, the plaintiffs could not have been contemporaneously aware of Goei's breach. The plaintiffs thus allege in substance that they did not know, nor could have known the essential elements of the cause of action until well after late 2004. *See* Dkt. #88 at 2. The plaintiffs' Motion for Leave to Amend, dated January 13, 2009, suggests that critical facts were not discovered until November 2008, when the plaintiffs were finally able to conduct various depositions in Singapore. *Id.* at 3. The fact that Goei remained CEO and a director at Plaintiff corporations until 2006 further suggests the plaintiffs were unaware of the essential elements of the breach.

Nevertheless, Goei argues that the plaintiffs were contemporaneously aware of the poison pill provision. Defendants' Opposition at 24. Other evidence suggests they may have been aware of the S$200,000 Teo Bock Hoon sellout discrepancy. *See infra*, III.(B)(4)(b). Thus, there are material disputes with respect to when the plaintiffs knew or should have known facts sufficient to bring their cause of action more than 3 years before they did.

ORDER - 14

Genuine issues of material fact exist with respect to three of the four elements of the plaintiffs' cause of action. Based on the facts as they appear in the light most favorable to Goei, a jury could return a verdict in his favor. Partial summary judgement is therefore inappropriate.

**C. Summary judgment is inappropriate with respect to Goei's Counterclaims**

The plaintiffs move for summary judgment dismissing Goei's counterclaims. Goei has asserted counterclaims for breach of contract, wrongful withholding of wages, conversion, and unjust enrichment. Dkt. #4 at 5-6. He argues that, during his final month of employment with MSCVC, the corporation refused to pay him his salary and certain other debts. *Id.*

The plaintiffs admit that they did not pay him wages during this period of his alleged disloyalty. Plaintiffs' Motion at 17. They argue that, as a matter of law, he is not entitled to such wages. *Id.* The plaintiffs are correct that Washington has adopted the position that "an agent is entitled to no compensation for conduct which is disobedient or which is a breach of his duty of loyalty." *Keystone Fruit Marketing, Inc. v. Brownfield*, 2008 WL 1971412 (E.D. Wash. May 5, 2008). However, the plaintiffs have not established at this stage that Goei engaged in conduct which was disobedient or which was a breach of his duty of loyalty. If he did not engage in such conduct, the plaintiffs may be liable for unpaid wages. Therefore, summary judgment is inappropriate.

## CONCLUSION

The Defendant's motion to strike certain exhibits (Dkt. #113) is **DENIED**, without prejudice. The plaintiffs' motion for Partial Summary Judgment (Dkt. #109) is **DENIED**.

Dated this 20th day of May, 2009.

RICARDO S. MARTINEZ
UNITED STATES DISTRICT JUDGE

ORDER - 15